IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| Linda M. Neal, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. Act No. _____ |
| ) | |
| Morgan Thermal Ceramics, ) | COMPLAINT |
| ) | DAMAGES |
| Defendant. ) | INJUCTIVE RELIEF |
| ) | JURY TRIAL REQUEST |
| ) | |

COMPLAINT

COMES NOW, Plaintiff Linda M. Neal (hereinafter "Ms. Neal" or "Plaintiff"), and files her Complaint against Defendant Morgan Thermal Ceramics, and employer covered by Title VII and the Americans with Disabilities Act, for regarded as disability discrimination, race, and gender discrimination and retaliation, and shows the Court as follows:

PARTIES, JURISDICTION, AND VENUE

1.  Plaintiff, Linda Neal is an African American woman, with no disabilities who began working for Defendant Thermal Ceramics in about Spring summer About April 2021, through a placement by a temp agency, HireQuest, and the challenged termination occurred March 2 and 3, 2022.

2.  Defendant Morgan Thermal Ceramics is an employer with more than 15 employees, that is covered by Title I of the Americans with Disabilities Act and Title VII, and is located and does business at 2102 Old Savannah Road, Augusta, GA 30906, whose registered agent is CT Corporation Systems, as Registered Agent for Purpose of Service, 289 S. Culver Street, Lawrenceville, GA 30046.

1

3. This case involves facts that support one or more federal civil rights claims, where this Court has jurisdictional authority under 28 U.S.C. §§ 1331 and 1343(a)(3 & 4), over Plaintiff's claims against Defendant Thermal Ceramics, that allege one or more violations of the Americans with Disabilities Act, for regarding her as disabled and doing one or more acts prohibited under 42 U.S.C. § 12101, et seq., and for retaliation for opposition to disability discrimination, race and gender discrimination and retaliation under Title VII, and race discrimination under 42 U.S.C. § 1981.

4. Venue is proper in this district under 28 U.S.C. § 1391(b) (1 & 2) and (c) because Thermal Ceramics resides in this district and division, and a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

5. All conditions precedent to the institution of this suit under Title VII and the ADA have been fulfilled against Thermal Ceramics because Plaintiff timely filed a Charge with the Equal Employment Opportunity Commission, as to Respondent Thermal Ceramics, on or about May 26, 2022, alleging discrimination under disability, retaliation, race and sex, and under Titles I and VII, assigned Charge No. 410-2022-03515, and the EEOC issued the Notice of Right to Sue dated June 2, 2022, where this action is filed within ninety days of receipt of said Notice.

6. A Charge was sought to be filed, or was filed separately against HireQuest, the temp agency that placed Plaintiff with Thermal Ceramics, where that Charge was filed within 180 days of March 2, 2022, but Plaintiff has not received notice of an assigned Charge Number, where Plaintiff intends to request a Notice of Right to Sue after a Charge Number is assigned, and to add HireQuest as a party.

FACTS

7.      Through a temp agency, HireQuest, Plaintiff began to work at Thermal Ceramics in about April 2021.

8.      Plaintiff was supervised day-to-day by Thermal Ceramics supervisors or managers, with Thermal Ceramics conducting managerial duties, such as making assignments and training employees.

9.      Thermal Ceramics managers and supervisors had Plaintiff work in the following departments prior to the challenged period in March of 2022:  A-2 and Boarding.

10.     The work in Kaowool required similar physical strength and endurance as the work in A-2 and Boarding.

11.     The physical work demands or conditions in Kaowool may have been more arduous than in A-2 and Boarding because staffing turnover was frequent in Kaowool.

   Description of Physical Tasks in A-2

12.     In A-2 the tasks included using a water jet to cut circles in heavy boards, then collect and stack the circles on carts, wheel the carts to a machine, put the circles in the machine that milled them.

13.     After the cut outs were milled, they were put in an oven to cure.

14.     The cut outs were removed from the oven, stacked and boxed, and ready for shipping.

15.     Plaintiff operated the A-2 water-jet as a temporary assignment.

   Description of Physical Tasks in Boarding

16.     The Boards job involved unloading boards out of the drier onto palette, prepare and load palettes for shipping.

17. The boards vary in size, thickness, and weight, sometimes exceeding 5-6 inches in thickness, weighing over 50 lbs., requiring two to four people to lift them.

18. The palettes were loaded and transported to a milling machine.

19. The boards were put in a milling machine, that must be monitored because boards can get stuck and employees, which required employees to get the stuck boards and re-start the machine.

### A Permanent Position Was Better Pay, Terms and Conditions and Possible Benefits

20. Temporary assignments paid about $14.00 per hour and had no benefits, and there was no guarantee of being able to work a full 40 hours per week.

21. A "permanent employee" was a Thermal Ceramics employee, and made about $18.00 per hour, with options of benefits like insurance, and more regular work times.

### Plaintiff Volunteered for Overtime and Had Perfect Attendance

22. Plaintiff often volunteered for and worked over-time, including sometimes working from 4:30 AM until 4:30 PM, and the going back in at 9:00 or 10:00 PM, and work until later the morning, doing a "double-shift."

23. Plaintiff had perfect attendance, whereas other temporary and some permanent employees did not, and discovery will show attendance records of persons made permanent.

### Application for Permanent Position in June 2021 in A-2 and Boards, Where Ms. Liz Promised the A-2 Position, but that Promise was not Kept

24. In about June 2021, Plaintiff bid on permanent positions, one operating the A-2 water-jet, and the other in Boards.

25. Ms. Liz (LNU) of Defendant Thermal Ceramics human resources or personnel department indicated that Plaintiff would be hired or promoted to the better permanent position in A-2.

26. Plaintiff regularly attempted to check on when the promotion or hiring would occur, going to Ms. Liz once or twice a week.

27. Management did not hire or promote Plaintiff to either permanent position.

28. Management left Plaintiff as a temporary worker, primarily in A-2, although she was shuffled between A-2 and Boarding.

29. Mr. Frails, who supervised A-2, or was an area lead, said several times that Plaintiff should have been permanent.

Plaintiff Applies Again for Permanent Positions in February 2022

30. The permanent positions in A-2 and Boards were never filled, and in mid-February 2022, the permanent positions in A-2 and Boards were posted again.

31. Plaintiff bid for each again.

Thermal Ceramics Management Did Not Select Plaintiff for the Permanent Position, Alleging the Non-Selection Was Based on a Medical Condition with Plaintiff's Back, Unlawfully Regarding Plaintiff As If She Were Disabled, Which Plaintiff Lawfully Opposed

32. On March 2, 2022, Bruce Johnson, Thermal Ceramics' management, came to Plaintiff in A-2, and told her she was being sent to work in the South Kaowool department, which requires lifting at least as strenuous, if not more so than in A-2 or Boarding.

33. The A-2 temporary position that Plaintiff was then working, and as to which she had bid for a permanent position, according to Bruce Johnson, had allegedly been filled by someone who had more time/experience than Plaintiff, a claim that was not verified at the time.

34. Plaintiff asked about her bid for the open Board position, but Johnson said she could not go to Boards, where the bid system showed there was an open permanent position, because she had injured her back two times and had gone to the nurse each time.

5

35. Plaintiff asked Johnson if she allegedly can't go to the Boards position because of a bad back, then how is she suited to work in South Kaowool, which is at least as physically demanding or more so than in Boards and A-2.

36. Johnson brushed her off, as if his stated reasons were not real, or her concerns were not real, saying South Kaowool doesn't have "heavy work."

37. Plaintiff asked Johnson where he had heard that she had hurt her back and had gone to the nurse two times, and told him that the allegations were untrue.

38. Supervisor Johnson told Plaintiff to go talk to Ms. Liz in HR, so Johnson took Plaintiff in the golf-cart to Ms. Liz.

39. Plaintiff asked Ms. Liz why her Board bid was denied, because there were no other valid bids.

40. Ms. Liz said that Plaintiff could not go to Boards because Plaintiff had hurt her back twice.

41. Plaintiff asked where that information came from, saying it was untrue, and Ms. Liz could not answer that or provide any proof.

> Ms. Liz, Thermal Ceramics Management, Terminated Plaintiff in Response to Plaintiff's Protected Opposition to Management Regarding Her as Disabled by a Back Condition and Using that Regarded as Disability as the Reason the Job Opportunities were not Equally Available to Plaintiff.

42. Ms. Liz instructed Plaintiff to call Ms. Sabrina at HireQuest for another assignment, meaning an assignment not at Thermal Ceramics, meaning Ms. Liz was terminating her from Thermal Ceramics and the access to the bid system and permanent employment.

43. Plaintiff stated that she wanted to call Ms. Sabrina while in the office with Ms. Liz and Bruce Johnson.

44. Ms. Liz told Plaintiff that she had to leave work completely.

45. Plaintiff asked why did she have to leave, and asked to just step out of the office to make the call.

46. Ms. Liz agreed, and Plaintiff called Ms. Sabrina at HireQuest

47. Ms. Sabrina was unavailable, and Plaintiff left a message.

48. Ms. Liz told Plaintiff to call back after Plaintiff spoke with Ms. Sabrina.

49. Ms. Liz told Plaintiff to go home in the middle of a shift, not letting Plaintiff go back out to the floor to tell the other employees.

50. Plaintiff was told to leave work at around 10 AM about half-way through a twelve-hour shift.

51. Plaintiff went to her car and cried because the anxiety caused by the termination had taken her ability to pay for rent, car payments and food necessary for survival.

52. Shortly thereafter she would lose her car and have to stay with friends and family because of the termination.

53. She had to stay in the parking lot until she could get her emotions under enough control to drive home safely, and thereafter she was depressed and hurt.

54. Plaintiff did as she was told and on March 2nd, called Ms. Sabrina, who indicated that she had spoken with Ms. Liz, and that Plaintiff needed to call Ms. Liz.

55. Ms. Sabrina told Plaintiff to contact Ms. Liz's boss, but Plaintiff did not know who that was.

56. Plaintiff called Ms. Liz multiple times, and because Ms. Liz would not answer, left messages.

57. When Plaintiff finally reached Ms. Liz, she hurried off the phone, saying someone was there she needed to talk to and said that she would call Plaintiff back.

58. Ms. Liz never called Plaintiff back.

59. Plaintiff showed up for work the next day, March 3, 2022, at 4 AM.

60. Security allowed Plaintiff into the gate, and instructed her to try to get into the turnstile.

61. Plaintiff was blocked because her security badge had been turned off so she was denied entry at the turnstile.

62. Plaintiff's attendance was stellar, and she often volunteered to do a second shift or overtime.

63. Plaintiff had not been given any warnings about alleged misconduct she needed to correct.

64. Upon information and belief there were White temporary employees who had been written up for misconduct but who were promoted or hired for permanent positions.

65. Upon information and belief there were male temporary employees who had been written up for misconduct but who were promoted or hired for permanent positions.

66. Plaintiff had, on occasion, already performed the job in Boards as to which she had put in a bid to become a permanent employee.

67. Plaintiff had an objective good faith belief that the reason proffered as to why she did not get either of the permanent jobs in Boards or A-2, was pre-textual, because she had not hurt her back twice, nor gone to the nurse twice about a back condition.

68. Plaintiff had an objective good faith belief that management of Thermal Ceramics was unlawfully regarding her as having a disability, that that they were wrongfully using to prevent her from being equally considered for a promotion or new job as a permanent employee.

69. Plaintiff had an objective good faith belief that the reason proffered as to why she did not get either permanent job was pre-textual because she knew that Ms. Liz and Mr. Johnson knew

she did not have a back condition and that she, Plaintiff, was able to and had performed the jobs in A-2 and Boards.

Damages

70. By the refusal to promote or hire Plaintiff to the Boards or A-2 permanent position, and the retaliatory termination, Plaintiff she suffered mental anguish, which with reasonable certainty, she will continue to suffer into the foreseeable future. (See paragraphs 51, 53 above)

71. By the failure to promote or hire Plaintiff to the Boards or A-2 permanent position, and the retaliatory termination, Plaintiff has suffered lost wages, and continues to suffer lost wages with reasonable certainty, she will continue to suffer into the foreseeable future. (See paragraph 52 above).

## COUNT ONE

ADA - Retaliatory Termination, for Protected Opposition
to Being Denied a Job Opportunity Because Defendant Thermal Ceramics
Unlawfully Regarded Plaintiff as Having a Back Condition
Taking the Position Plaintiff Was Not Able to Perform
a Job Similar to the Jobs Plaintiff had Performed

72. Plaintiff incorporates the paragraphs above as if fully stated herein for the construction of the complaint as a whole as applied to this Count.

73. As a lower paid temporary employee of Defendant Thermal Ceramics, Plaintiff had done or had been doing the job in A-2 and Boards prior to June 2021. ¶¶ 7, 20-21.

74. In June 2021 Plaintiff "bid" for two posted, or open, permanent positions in both A-2 and Boards. ¶ 24.

75. Not to long after Plaintiff's bid, Ms. Liz, a manager in Thermal Ceramics' personnel or human resources department, indicated that Plaintiff would get the permanent position in A-2. ¶ 25.

76. Over the next eight months Plaintiff checked or tried to check weekly with Ms. Liz, when she would be promoted or given the new permanent position, but Plaintiff was never promoted, or hired as permanent position, although Supervisor Frails thought she should have been. ¶¶ 26-29.

77. Ms. Liz and Thermal Ceramics never made good on the promise to make Plaintiff permanent in connection with Plaintiff's June 2021 bid and the promise by manager Ms. Liz. ¶¶ 26-29.

78. In late February 2022, Thermal Ceramics again posted open permanent positions in A-2 and Boards. ¶ 30.

79. Plaintiff saw the open, permanent position and put in bids for the positions. ¶ 31.

80. By then Thermal Ceramics management was not only aware of Plaintiff's able physical capacity and experience to do the open permanent positions in A-2 and Boards, but that knowledge had been the basis of daily assignments by management, used for their benefit. ¶¶ 8, 9, 12-19, 66.

81. Manager Liz had promised Plaintiff she would be given the A-2 permanent position in about June 2021. ¶¶ 25, 75.

82. Plaintiff relied on that promise and gave up pursuit of other employment, and worked extra to meet management's expectations to keep the promise of a permanent position alive.

83. Over the ten months as a temporary the daily physical labor did not bother Plaintiff, and it was obvious that she did not have a back condition that would impede assignments to jobs requiring physical labor.

84. Over the ten-month period as a temporary, Thermal Ceramics management knew that Plaintiff had perfect attendance, volunteered to work overtime, and double or extra shifts, did

not seek work time off for medical treatment, and was not warned nor written up because she had difficulty performing the physically demanding labor to which management assigned her daily. ¶¶ 22-23, 62-63.

85. On March 2, 2022, after Plaintiff bid on the open positions in A-2 and Boards, Bruce Johnson, management of Thermal Ceramics, came to A-2 and told Plaintiff she was being transferred to South Kaowool, similar or greater. ¶¶ 10, 11, 32.

86. Plaintiff asked Johnson what happened to her bid for the A-2 position, and Johnson said it was given to someone with more seniority, which was not verified. ¶ 33.

87. Plaintiff asked Johnson about the open permanent position in Boards, upon which she had placed a bid, and Johnson said that Plaintiff could not have the Boards position because she had to go to the nurse about her back twice. ¶ 34.

88. Plaintiff objected to Johnson that this allegation of being disabled and unable to do the work, telling Johnson that it was untrue to say that Plaintiff had been to the nurse twice about her back, where it was obvious that she had been doing and could do the work. ¶¶ 35, 37, 67-69.

89. Johnson took Plaintiff to HR manager Ms. Liz, so that Ms. Liz, would have to address Plaintiff's questions and opposition to the pre-textual reason of Plaintiff's disability that Johnson had offered as to why Plaintiff was not given the permanent position in A-2 or Boards. ¶¶ 36, 38,

90. Plaintiff asked Ms. Liz why her bid for Boards was denied, also pointing out that there were no other valid bids. ¶ 39.

91. Ms. Liz said that Plaintiff could not go to Boards because Plaintiff had hurt her back twice and that she had to go to the nurse twice. ¶ 40.

92. Plaintiff asked where that information came from, and Ms. Liz could not answer that, nor provide any proof of visits to the nurse. ¶ 41.

93. As a continuation of the same conversation in which Ms. Liz heard Plaintiff oppose the denial of the promotion to a permanent position and the transfer to Kaowool because Ms. Liz and Mr. Johnson were regarding Plaintiff as physically disabled because of a back condition, Ms. Liz, Thermal Ceramics HR manager, told Plaintiff to contact the temp agency for reassignment – meaning Ms. Liz was terminating Plaintiff. ¶ 42.

94. Ms. Liz instructed Plaintiff leave work and call Ms. Sabrina at HireQuest, and Plaintiff attempted while in the office in front of Ms. Liz and Johnson, but Ms. Liz said that Plaintiff needed to leave work completely; Plaintiff asked if she could step into the hall and call Ms. Sabrina, and Ms. Liz agreed. ¶¶ 43-46.

95. Plaintiff called Ms. Sabrina, but she was initially unavailable, and Ms. Liz said to call back after Plaintiff had spoken with Ms. Sabrina. ¶¶ 47-48.

96. Ms. Liz told Plaintiff to leave work for the day, in the middle of the shift, and not to return to the floor. ¶¶ 49-50.

97. When Plaintiff reached Ms. Sabrina, Ms. Sabrina indicated that she had spoken to Ms. Liz, and directed Plaintiff to call Ms. Liz. ¶ 54.

98. Plaintiff attempts to call Ms. Liz multiple times, and when she reached Ms. Liz, Ms. Liz ushered her off the phone, saying she would call Plaintiff back; but never did. ¶¶ 56-58.

99. The next day, when Plaintiff attempted to enter the plant, her security badge had been deactivated and she could not enter. ¶¶ 59-61.

100. As a result of the retaliatory termination for protected oppositional activity Plaintiff suffered and continues to suffer damages as alleged above in paragraphs ¶¶ 51-53, 70-71.

## COUNT TWO

### Race Discrimination under Title VII and 42 U.S.C.§ 1981

101. Plaintiff incorporates the paragraphs above as if fully stated herein for the construction of the complaint as a whole as applied to this Count.

102. Plaintiff is Black. ¶ 1.

103. Ms. Liz, HR manager for Thermal Ceramics is White.

104. Mr. Johnson, HR manager for Thermal Ceramics is White.

105. Mr. Johnson and Ms. Liz knew that Plaintiff was from a temporary employment agency and not a permanent Thermal Ceramics' employee (¶¶ 43-46), and that she would not be protected by internal policies and procedures intended to prevent unlawful employment treatment and decisions, but that were intended to promote legitimate business decisions, and retention of trained and effective employees by fair and equitable treatment.

106. Mr. Johnson and Ms. Liz knew that a high percentage of the temporary workers were Black, and not connected to White persons of authority superior to Johnson and Ms. Liz within the company.

107. Ms. Liz and Mr. Johnson knew they could immediately keep Plaintiff out of the plant and prevent her from communicating with other employees, Black and White, about the manipulation and false reasons used to deny Plaintiff a permanent position, and the unmet promises emanating from the "bidding" system.

108. On March 2, 2022, Mr. Johnson and Ms. Liz told Plaintiff she could not have the permanent position in Boards for which she had bid, because according to Mr. Johnson and Ms. Liz, Ms. Neal had gone to the nurse twice for a back condition. ¶¶ 34, 40.

109. But Plaintiff pointed out to each that they were wrong, that she had not been to the nurse about a back condition, and they had no evidence to prove she was disabled and unable to perform positions she sought. ¶¶ 34, 37, 67-69.

110. The implication of Plaintiff's opposition to their actions was that Plaintiff had caught them in a lie about Plaintiff being disabled, as to why they would not make Plaintiff, an African American, a permanent Thermal Ceramic employee.

111. The reaction of Ms. Liz was to immediately terminate Plaintiff, whose race and status as a temporary employee were known and obvious to Ms. Liz and Mr. Johnson.

112. The action to immediately terminate Plaintiff went unchecked and uncorrected by Mr. Johnson. ¶¶ 42-50.

113. As HR employees they knew that because of laws prohibiting discrimination in employment decisions, that the truth should be stated to account for why an employee who is qualified for a position has been denied that position, and that the reasons could not be prohibited reasons.

114. As HR employees they knew and were required to follow the law that it was unlawful to regard a person as having a disability, and to deny a person a job opportunities as if the unlawfully alleged disability was a lawful reason to disqualify the person from the job opportunity.

115. Ms. Liz and Mr. Jonson knew that the reason they had given Plaintiff for not making her a permanent employee was false, and they knew that Plaintiff knew that the reason was false, and that she could expose that fact to others, which could result in adverse action against them and expose their wrongdoing as managers on behalf of Thermal Ceramics.

116. The immediate termination of Plaintiff was without reasoned legitimate business consideration, where legitimate business decisions factor in the truth regardless of source.

117. Legitimate business decisions about termination consider the employee's past performance versus the time, effort and costs to train a replacement, where there were already unfilled openings.

118. Plaintiff had perfect attendance and volunteered for overtime and double shifts. ¶¶ 22-23, 62-63; also see ¶ 84.

119. There was no emergency or legitimate business reason why the termination could not have been reversed that day, or thereafter. ¶¶ 22-23.

120. Plaintiff repeatedly called to essentially beg for work, but Ms. Liz refused to answer or return the calls, and when reached, promised to call but never did call, putting aside equal treatment under the law. ¶¶56-58.

121. Under the totality of the circumstances that existed as of the moment Ms. Liz told Plaintiff to get a re-assignment from Ms. Sabrina at HireQuest (¶ 42), and at all times and circumstances thereafter, Ms. Liz as a manager of Thermal Ceramics terminated Plaintiff because of race, even if not solely because of race; alternatively, Ms. Liz terminated Plaintiff because of one or more prohibited reasons.

122. Because of Plaintiff's race, or in combination with the retaliation for her protected opposition, the termination was not reversed by Mr. Johnson, Ms. Liz, nor Thermal Ceramics. ¶¶ 42-50, 56-58.

123. As a result of the discriminatory termination, Defendant Thermal Ceramics caused Plaintiff to suffer damages as stated in paragraphs ¶¶ 51-53, 70-71 above.

WHEREFORE, Plaintiff prays judgment against Defendant for the following:

a. Compensatory damages as allowed by law;

b. Special damages, as more particularly shown at trial;

c. Punitive damages, for willful, wanton or reckless disregard of the federal rights of all;

e. Reasonable attorney fees, costs and expenses of litigation under 42 U.S.C. § 1988;

f. Any other and further relief so ordered or required by law, including reinstatement or front pay in lieu of reinstatement.

A JURY TRIAL IS HEREBY REQUESTED.

This the 31st day of August 2022.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
Attorney for Plaintiff
P.O. Box 3248
Augusta, GA 30914
706-737-4040
FAX 706-736-3391
jpbatson@aol.com

Prepared by:

John P. Batson
P.O. Box 3248
Augusta, GA 30914
706-737-4040